UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

In re:

WIRE COMM WIRELESS, INC.,  No. 2:07-cv-02451-MCE

    Debtor.
_____

NEW CINGULAR WIRELESS SERVICES,
INC., A Delaware corporation,

    Appellant,

  v.  <u>MEMORANDUM AND ORDER</u>

MICHAEL F. BURKHART, as Trustee,

    Appellee.

----oo0oo----

New Cingular Wireless Services, Inc. ("New Cingular") appeals from the bankruptcy court's refusal to compel arbitration of its dispute with Wire Comm Wireless, Inc. ("Wire Comm"). For the reasons set forth below, this Court reverses the decision of the bankruptcy court and directs the parties to arbitrate their claims against each other in accordance with their written agreement to do so.

1

**BACKGROUND**

Wire Comm operated retail stores selling cellular phone equipment and services, and was a dealer for New Cingular. New Cingular claims it advanced $934,797.47 to Wire Comm in late 2004 and early 2005 because of delays in resolving commission disputes. Ultimately, however, after taking into account commissions actually owed Wire Comm, New Cingular alleges Wire Comm still owed a net $864,192.47 in un-recouped advances. In June of 2005, after a brief meeting to discuss repayment of these advances, Wire Comm terminated its dealer agreement with New Cingular, claiming that it in fact was still owed additional commissions and residuals.

The August 1, 2004 Exclusive Dealer Agreement between Wire Comm and AWS, New Cingular's predecessor,[1] required that "all claims... and disputes between Dealer [Wire Comm] and Company [AWS] must be resolved by submission to binding arbitration. (See Compl., Ex. B). In September 2005, shortly after termination of its dealer agreement with New Cingular, Wire Comm invoked the provisions of that arbitration clause by commencing an arbitration proceeding against New Cingular.
That proceeding sought recovery of unpaid commissions which Wire Comm claimed estimated at approximately $1,225,000.00. New Cingular counterclaimed, however, for reimbursement of debts totaling $1,120,825.70 and for damages totaling $1,828,887.47.
///

---

[1] New Cingular acquired AWS on October 24, 2004 and is its successor company.

During the following year the parties completed discovery in anticipation of an arbitration hearing, which was continued several times. On December 8, 2006, just four days before arbitration was finally scheduled to begin, and after preliminary motions had been decided, Wire Comm filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code.

The December 12, 2006 arbitration hearing was suspended because of Wire Comm's bankruptcy filing. On February 6, 2007, New Cingular filed a proof of claim with the bankruptcy estate in the amount of $2,949,703.17. The appointed bankruptcy trustee (and appellee herein), Michael F. Burkhart, then reasserted Wire Comm's claims against New Cingular by initiating an adversary proceeding and objecting to New Cingular's proof of claim.

On September 17, 2007, New Cingular moved to stay the trustee's adversary proceedings so as to permit completion of the aborted arbitration hearing. The bankruptcy court denied that motion, and the instant appeal followed.

**STANDARD**

The decision to grant or stay relief from the automatic stay occasioned by bankruptcy, in this case for purposes of permitting arbitration to proceed, is committed to the sound discretion of the bankruptcy court and is accordingly reviewed under an abuse of discretion standard. In re Conejo Enterprises, Inc., 96 F.3d 346, 351 (9th Cir. 1996).

///

///

3

1  The decision of the bankruptcy judge will be reversed only if
2  based on an erroneous conclusion of law or when the record
3  contains no evidence on which the bankruptcy court could
4  rationally have based its decision.  Id.

## ANALYSIS

8  Because New Cingular filed a proof of claim against Wire
9  Comm in the adversary proceeding commenced once bankruptcy was
10 filed, the bankruptcy judge concluded that the entire dispute was
11 "core" in nature because it involved disallowance of a claim and
12 a counterclaim under 28 U.S.C. § 157(b)(2)(B)-(C).  (See App.
13 119:17-119:18).  The bankruptcy judge concluded that it was
14 within his discretion to deny arbitration under those
15 circumstances and pointed to the lack of any controlling Ninth
16 Circuit authority on the issue.  (See App. 119:6-120:1).  He felt
17 that arbitration was expensive and ran counter to the underlying
18 objective in bankruptcy to resolve all disputes in a unified
19 proceeding.  (App. 113:25-114:23).  While there is no dispute
20 that the underlying substance of the arbitrable dispute between
21 Wire Comm and New Cingular revolved around questions of state
22 law, and although the bankruptcy judge admitted that he may have
23 deferred to resolution of such claims in state court had such
24 proceedings been pending, the judge nonetheless concluded that
25 contractual arbitration was subject to a different analysis where
26 the trier of fact, an arbitrator, has to be hired by the parties.
27 (App. 117:6-23).
28 ///

4

In determining whether arbitration must in fact be enforced, this Court must first look to general principles underlying arbitration agreements. Strong federal policy in general favors the enforcement of arbitration agreements. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). The Federal Arbitration Act ("FAA") requires courts to "rigorously enforce agreements to arbitrate" even when such agreements implicate claims arising under federal statutes. Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987). The FAA "requires district courts to compel arbitration even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." Fisher v. A.G. Becker Paribas Inc., 791 F.2d 691, 698 (9th Cir. 1986). The FAA's overall mandate for arbitration is defeated only where circumstances demonstrate "a contrary congressional command", with the burden on the party opposing arbitration "to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." Id.

Examination of the text and purposes of the Bankruptcy Code reveals no hostility to arbitration. In re Mintze, 434 F.3d 222, 231 (3d Cir. 2006) (finding no evidence of congressional intent to preclude waiver of judicial remedies in either the statutory text or the legislative history of the Bankruptcy Code); MCI Telecomm. Corp. v. Gurga (In re Gurga), 176 B.R. 196, 200 (9th Cir. BAP 1994) (same, citing Mor-Ben Ins. Markets Corp., 73 B.R. 644 (9th Cir. BAP 1987).

///
///

1  "To the contrary.... the text of the Bankruptcy Court embodies
2  the principle that pre-petition contract rights [like an
3  agreement to arbitrate] are enforceable in a bankruptcy
4  proceeding except to the extent the Code specifically provides
5  otherwise." Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith,
6  Inc., 885 F.2d 1149, 1157 (3d Cir. 1989).
7      It follows that arbitration agreements are enforceable under
8  the FAA in bankruptcy proceedings unless arbitration of a
9  particular matter would inherently conflict with the underlying
10 purposes of the Bankruptcy Code. McMahon, 482 U.S. at 227; Hays
11 & Co., 885 F.2d at 1157; Mintze, 434 F.3d at 231; Gurga, 176 B.R.
12 at 200. A bankruptcy court has discretion to assess whether
13 arbitration would be consistent with the Bankruptcy Code if the
14 underlying claim is based on federal rights conferred by the
15 Code. Consequently, even where "core" bankruptcy jurisdiction is
16 present, if a dispute is not based on federal bankruptcy law,
17 bankruptcy courts have regularly permitted arbitration to
18 continue (or commence) despite the presence of such "core"
19 jurisdiction. Ins Co. of N. Am. v. NGC Settlement Trust &
20 Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.), 118 F.3d
21 1056, 1067 (5th Cir. 1997) (holding that the bankruptcy court
22 only has discretion to consider whether arbitration would be
23 consistent with bankruptcy objectives if the underlying claim "is
24 derived entirely from the federal rights conferred by the
25 Bankruptcy Code").
26 ///
27 ///
28 ///

In other words, whether or not a claim is "core" is not the dispositive factor in determining whether or not the claim is properly subject to arbitration.[2]  Instead, the primacy of bankruptcy in the claim is what controls.

As the Third Circuit explained in Mintze, "[t]he core/non-core distinction does not... affect whether a bankruptcy court has the discretion to deny enforcement of an arbitration agreement. Mintze, 434 F.3d at 229. Instead, even where "core" jurisdiction is present, "the bankruptcy court will not have discretion to override an arbitration agreement unless it finds that the proceedings are based on provisions of the Bankruptcy Code that "inherently conflict" with the Arbitration Act or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code." MBNA Am. Bank v. Hill, 436 F.3d 104, 108 (2d Cir. 2006).  Therefore, the bankruptcy judge here had to evaluate the nature of the underlying claims and their effect upon the bankruptcy proceedings before determining whether he had the discretion to deny arbitration.

In this case, the underlying claims are unquestionably not predicated on federal bankruptcy law involving, as they do, claims against New Cingular for breach of the Exclusive Dealer Agreement and alleged indebtedness incurred under that agreement.

---

[2] As indicated above, the bankruptcy judge concluded that the bankruptcy court had "core" jurisdiction over this matter because it involved disallowance of a claim and counterclaim under 28 U.S.C. § 157(b).  While appellant disagrees with that conclusion, as discussed below the distinction between "core" and "non-core" jurisdiction ultimately does not matter for purposes of adjudicating this appeal.  Consequently, this Court will assume, but not decide, that the underlying claim was indeed "core" in nature.

7

1  Indeed, arbitration of Wire Comm's claims, and New Cingular's
2  ensuing counterclaim, was pending and nearly brought to fruition
3  before the bankruptcy proceedings even commenced.  Those
4  underlying claims were entirely rooted in state, rather than
5  federal, law.
6       The fact that allowance of the claim and counterclaim in
7  bankruptcy required bankruptcy court approval does not change
8  that analysis, even assuming that the need for such court
9  involvement ultimately made the claims "core" in nature.  In
10 Snake River Dairyman's Ass'n, 2004 WL 496031 (Bankr. D. Idaho
11 2004), the underlying claims, like those at issue here, were
12 alleged to be "core" because the Bankruptcy Code governed their
13 allowance under 28 U.S.C. § 157(b).  The court rejected the
14 contention that arbitration should not continue, despite the
15 pendency of bankruptcy proceedings, explaining as follows:

> "Even if Creditor's claims against Debtor represent core proceedings, Debtor has failed to make the requisite showing that enforcing Creditor's right to arbitration of the claims would frustrate any underlying purpose of the Bankruptcy Code, or have such a potential adverse impact on the bankruptcy proceedings that this Court should resolve this dispute."

21 Id. at *6.

22      The Snake River court continued:

> "Creditor's claims are based solely upon state law. Those claims will be resolved without resort to interpreting the Bankruptcy Code or Rules.  In addition, the parties have made substantial progress towards preparing for an arbitration hearing, some of which effort may be duplicated if this court were to adjudicate the claims."

27 ///
28 ///

Like Snake River, this case can be considered "core" only because of the claims allowance procedure specified by the Bankruptcy Code.[3] The two cases are also analogous in that both involve claims exclusively grounded in state law except for that allowance provision.[4] Similar, too, is the fact that in both instances the parties made considerable progress towards preparing for arbitration before bankruptcy was commenced. Finally, and most significantly, in both cases there was no showing that enforcing arbitration would conflict with the purposes of the Bankruptcy Code.

///
///
///

---

[3] Although the Ninth Circuit's decision in Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.), 912 F.2d 1162 (9th Cir. 1990), was decided in the context of whether the bankruptcy court in that matter was obligated to abstain from jurisdiction under 28 U.S.C. § 1334 (a subject this Court need not address given its determination the adversary proceeding here should simply be stayed pending arbitration), Tucson Estate's discussion of the difference between adjudicating the underlying claim and allowing or disallowing that claim in bankruptcy is nonetheless instructive. The court rejected the argument that the claims at issue in Tucson Estates implicated bankruptcy simply because a decision would ultimately have to be made by the bankruptcy court on the allowance of the claims. As the court stated, this "confuses the task of determining whether the [creditors] have a claim, and determining what to do with it in bankruptcy if they do." Id. at 1168. As the court noted, "[t]he parties dispute not whether a claim should be disallowed but instead whether the plaintiffs have a claim to bring to the bankruptcy court in the first place." Id.

[4] While Appellee cites Durkin v. Benedor, 204 F.3d 1276 (9th Cir. 2000) for the proposition that the bankruptcy judge acted within his discretion in denying relief from the automatic stay, that case involved a statutory claim under the Bankruptcy Code (11 U.S.C. § 365(g)) and is therefor distinguishable from the present matter, where the underlying claims are based entirely on state law.

1  <u>Snake River</u> concluded that given those factors, as well as the
2  congressionally established "strong policy favoring enforcement
3  of arbitration clauses in private contracts", arbitration should
4  continue.  That conclusion is equally compelling here.
5      In addition, the fact that New Cingular filed a proof of
6  claim in the bankruptcy proceedings, in order to partake in the
7  distribution of Wire Comm's estate, does not waive its right to
8  arbitration.  <u>Mor-Ben Ins. Mkts.</u>, 73 B.R. at 647.  While a
9  creditor may subject himself to the jurisdiction of the
10 bankruptcy court by filing such a claim, as <u>Mor-Ben</u> explained,
11 "the mere fact that a court has jurisdiction does not preclude it
12 from compelling the parties to arbitrate where the arbitration
13 forum is required by the Federal Arbitration Act."  <u>Id</u>.
14     The fact that the Trustee or other creditors may not have
15 been parties to the agreement to arbitrate is also not
16 dispositive, and does not carry with it the risk of inconsistent
17 rulings as Trustee's counsel contends.  The bankruptcy estate is
18 bound by the actions of the debtor prior to bankruptcy, including
19 his or her waiver of the right to litigate by agreeing to
20 arbitration.  The estate stands in the shoes of the debtor and is
21 subject to defenses that could have been asserted against the
22 debtor, including a contractual right to arbitration.  <u>See</u> <u>Hays</u>
23 <u>and Co. v. Merrill Lynch</u>, 885 F.3d at 1154.
24 ///
25 ///
26 ///
27 ///
28 ///

1  The Hays court, citing the Supreme Court's decision in Moses H.
2  Cone Hosp. v. Mercury Const. Corp., 46 U.S. 1, 20 (1983), found
3  specifically that "the mere existence of creditors in the core
4  bankruptcy proceeding who might be indirectly affected by the
5  arbitration decision and who were not parties to the [arbitration
6  agreement] does not require the denial of [the motion to compel
7  arbitration]. Id. at 1159.  Additionally, contrary to the
8  bankruptcy judge's contention here that an underlying objective
9  in bankruptcy is to resolve all related disputes in a single
10 proceeding, the Hays court further noted that the 1984 Amendments
11 to the Bankruptcy Code made it clear that Congress did in fact
12 "not envision all bankruptcy related matters being adjudicated in
13 a single bankruptcy court." Id. at 1157.  The current bankruptcy
14 scheme virtually requires some bankruptcy-related proceedings to
15 proceed outside the bankruptcy court.  Id. at 1160.
16     Given all the above, while the bankruptcy judge may have
17 been correct in asserting that no Ninth Circuit decision
18 definitively addresses whether the bankruptcy court may deny
19 arbitration in a "core" proceeding, this Court believes that the
20 overwhelming weight of authority on this issue, under the
21 circumstances of the present case, points towards the conclusion
22 that arbitration should proceed in accordance with the agreement
23 of the parties.  The bankruptcy court accordingly abused its
24 discretion in declining to stay the adversary proceeding so as to
25 permit the pre-bankruptcy arbitration proceedings to continue.
26 ///
27 ///
28 ///

11

**CONCLUSION**

The bankruptcy court's denial of Appellant's Motion to Stay Adversary Proceedings Pending Arbitration is REVERSED.[5]  Relief from the automatic stay is hereby GRANTED in order to permit completion of the arbitration proceedings between Wire Comm and New Cingular.

IT IS SO ORDERED.

Dated: September 15, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[5] Because the court determined that oral argument would not be of material assistance, this matter was decided on the briefs. E.D. Cal. Local Rule 78-230(h).

12